OPINION
Defendant-appellant/cross-appellee, Gail A. Hamilton, appeals from a judgment of the Domestic Relations Division of the Warren County Court of Common Pleas, granting her a divorce from plaintiff-appellee/cross-appellant, Charles ("Skip") H. Hamilton, Jr., and dividing the parties' marital property, but refusing to award her spousal support. Skip cross-appeals from the same judgment.
Skip and Gail Hamilton were married on May 14, 1982. No children were born as issue of their marriage.
Skip is the president and chief executive officer of the Charles Hamilton Excavating Company. His father, Charles H. Hamilton, Sr., started the company in 1964 and incorporated it in 1968. At the time of the incorporation, Charles Hamilton, Sr. owned all 100 shares of the company's stock. In 1980, the company's stock was split five for one. At the time of Skip and Gail's marriage, the company's 500 shares of stock were held as follows:
Charles Hamilton, Sr. 266 shares
Mary Hamilton (Skip's mother) 116 shares
Skip Hamilton 103 shares
Sharon K. Earnhart (Skip's sister) 15 shares
 After the marriage, Skip's parents gifted to him an additional 22 shares of the company's stock in 1984 and 1985. They also gifted 109 shares of the company's stock to his sister between 1982 and 1985. Consequently, by 1993, the company's 500 shares of stock were held as follows:
Charles Hamilton, Sr. 251 shares (50.2%)
Skip Hamilton 125 shares (25%)
Sharon K. Earnhart 124 shares (24.8%)
In August 1993, Charles Hamilton, Sr., retired, and the company redeemed his shares for $557,136. After the company redeemed Sharon Earnhart's shares for $616,110, in June 1997, Skip, who owned the company's remaining 125 shares, became the sole owner of the company.
The Hamiltons are nationally renowned "cutting horse"[1]
competitors, who spent a significant amount of time and money during their marriage, pursuing their interest in this event. Gail is also an accomplished sculptor, who has sold several of her works.
In late 1998 or early 1999, Gail left the marital residence and relocated to the parties' ranch in Texas. She began a relationship with Charles Spence, who gave her a number of gifts, including a diamond ring, a $50,000 horse, $33,000 in cash, and $52,000 in stock. After Spence died unexpectedly, Gail began a relationship with Preston Carter, who gave her a sapphire diamond ring, and another diamond ring worth, by her estimate, $25,000.
In February 1999, Skip filed for divorce. Gail answered and counterclaimed for divorce. A trial was held in April 2000. The primary issue tried was the valuation and division of Skip's company.
On May 24, 2000, the trial court issued a decision finding the value of Skip's company had "increased tremendously" during the parties' marriage, and "[t]he increase pursuant to Middendorf v. Middendorf [82 Ohio St.3d 397, 1998-Ohio-403] is marital due to the hard work and talent that [Skip] has displayed in making this corporation grow." The trial court found the company's fair market value was $3,935,000, which included $1.2 million for the company's goodwill. The trial court determined that 25 percent of the company is Skip's separate property, while the remaining 75 percent is a marital asset to be divided equally with Gail. The trial court ordered Skip to submit a plan for paying Gail her share of the marital portion of the company within 30 days. The trial court denied Gail's request for spousal support, stating, among other things, it "is confident that she will be able to either support herself from her own labors or find a wealthy man who is both eager and willing to keep her in the lifestyle that she has grown accustomed to." The trial court also found the parties had agreed on the division of a number of their assets, including their cash assets, cutting horses, and horse equipment.
Skip subsequently moved the trial court to reconsider its decision, arguing, among other things, that the trial court "inequitably divided" the parties' personal property by not taking into account the unequal value of the horses each party received under the terms of the agreement. The trial court rejected Skip's argument, finding that while the division of the horses' values was "greatly skewed" in Gail's favor, it nevertheless was the division to which the parties had orally agreed in court.
In October 2000, the trial court held an evidentiary hearing in which it considered, among other things, the federal income tax implications of Skip's having to pay Gail her marital share of the company's value. On November 30, 2000, the trial court issued a decision, ordering that the proceeds from the sale of a vacant lot owned by Skip be transferred to Gail, as she had proposed. However, the trial court rejected Gail's proposals that the balance of the award be evidenced by a promissory note payable to her in installments over a ten-year period, with interest, and that Skip convert his company from "C corporation" status to "S corporation" status.[2] Instead, the trial court adopted Skip's proposal that Gail's award of her marital share of the company be reduced by the amount of capital gains taxes he would incur if he were to sell the company as of March 31, 1999, the marriage's termination date chosen by the trial court.
The trial court incorporated its prior decisions in a January 9, 2001 judgment entry and decree of divorce. Gail appeals from that judgment, raising three assignments of error. Skip cross-appeals from that judgment, raising three cross-assignments of error. We shall address these assignments of error in an order that facilitates our analysis.
Cross-Assignment of Error No. 1:
 THE TRIAL COURT ERRED IN FINDING THAT ANY PORTION OF THE COMPANY IS MARITAL PROPERTY.
Skip argues the trial court erred by concluding that 75 percent of the company is marital property, while only 25 percent is his separate property. He asserts the company's outstanding 125 shares are his separate property, and the "stock split events" and the company's redemption of his father's and sister's shares did not "transmute" his separate property into marital property. However, Skip has subsequently abandoned this argument. The 1980 five-for-one split of the company's stock obviously could not have transmuted[3] or converted Skip's separate property into marital property, since that event took place prior to the parties' 1982 marriage. The trial court never held otherwise. Furthermore, as Skip essentially acknowledges in his reply brief, the trial court did not find that 75 percent of the company had been transmuted from separate to marital property. Instead, it found that 75 percent of the appreciation
in Skip's shares was marital property pursuant to Middendorf v.Middendorf, 82 Ohio St.3d 397, 1998-Ohio-403. Accordingly, Skip's first cross-assignment of error is overruled.
Assignment of Error No. 1:
 THE TRIAL COURT ERRED IN DELIERATELY REFUSING TO AWARD WIFE AS MARITAL PROPERTY 50% OF THE APPRECIATION WHICH OCCURRED TO THE 125 SHARES OF THE COMPANY DURING THE MARRIAGE DUE TO HUSBAND'S LABOR.
Cross-Assignment of Error No. 2:
 THE TRIAL COURT ERRED AS A MATTER OF LAW IN AWARDING DEFENDANT ANY INTEREST IN THE COMPANY AS NO EVIDENCE ESTABLISHED THAT ANY APPRECIATION IN VALUE OF PLAINTIFF'S STOCK DURING MARRIAGE WAS CAUSED BY LABOR OF PLAINTIFF OR DEFENDANT.
We shall address these two assignments of error together, since they are interrelated.
Gail argues the trial court erred by not awarding her one-half of all
of the company's appreciation in value that occurred during the marriage because the trial court concluded that the company's appreciation in value was marital. Skip argues the trial court erred by awarding Gailany percentage of the appreciation in the company's value because she failed to present sufficient evidence showing that the appreciation resulted from his or her labor.
A trial court has broad discretion in the division of property in divorce cases, and its decision will not be reversed absent an abuse of discretion. Middendorf, 82 Ohio St.3d 397, 401. A trial court abuses its discretion when it acts in an unreasonable, arbitrary, or unconscionable fashion. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. A trial court does not abuse its discretion when there is some competent, credible evidence to support its decision. Middendorf at 401.
A trial court must divide marital property equally, unless it would be inequitable to do so. R.C. 3105.171(C)(1). If an equal division of marital property would be inequitable, then the court must divide the marital property equitably rather than equally. Id. "Marital property" includes "all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage." R.C. 3105.171(A)(3)(a)(iii).
Marital property does not include separate property. R.C.3105.171(A)(3)(b). "Separate property" is defined in R.C. 3105.171(A)(6)(a) in relevant part as follows:
 "Separate property" means all real and personal property and any interest in real or personal property that is found by the court to be any of the following:
 An inheritance by one spouse by bequest, devise, or descent during the course of the marriage;
 Any real or personal property * * * that was acquired by one spouse prior to the date of the marriage;
* * *
 Passive income and appreciation acquired from separate property by one spouse during the marriage;
* * *
 (vii) Any gift of any real or personal property * * * that is made after the date of the marriage.
 "Passive income" is "income acquired other than as a result of the labor, monetary, or in-kind contribution of either spouse." R.C. 3105.171(A)(4).
In Middendorf, the Ohio Supreme Court examined the legal standards for determining when appreciation in separate property becomes marital property for purposes of property division in a divorce case under R.C.3105.171. Middendorf, 82 Ohio St.3d at 399. In that case, the trial court had found husband's one-half interest in a stockyard he co-owned with his brother was his separate property, and wife had failed to present sufficient evidence to allow it to determine the appreciation in the stockyard's value during the marriage. Id. at 397-398. Both parties appealed the trial court's decision, but the appeals were dismissed for lack of a final appealable order. Id. at 398. However, the court of appeals ruled that the trial court, after having found that any appreciation in the stockyard's value during the parties' marriage was marital property, should have required that additional evidence be presented on the valuation of husband's stockyard. Id.
On remand, the magistrate appointed an expert to value the stockyard. Id. The expert valued husband's one-half interest in the stockyard at $201,389, as of the date of the parties' marriage, and $309,930, as of the date of the initial divorce hearing — an increase of $108,541. Id. The magistrate concluded the stockyard's increase in value was marital property because it was the direct result of the labor or in-kind contribution of husband. Consequently, the magistrate held wife was entitled to one-half of the increase or $54,270.50. Id. The trial court overruled the parties' objections to the magistrate's finding, and adopted it as its own. Id. at 399. The court of appeals upheld the trial court's decision on appeal. Id.
The Ohio Supreme Court affirmed the judgment of the court of appeals. Id. at 403. The Middendorf court rejected husband's contentions that wife presented "no evidence that the increase in the stockyard's value was due to his funds or labor[,]" and that "the increase was due solely to passive appreciation from `market changes.'" Id. at 402. The Middendorf
court noted the trial court found the increase in the stockyard's value was the "direct result of the pivotal role" husband played in the stockyard's management during the course of the marriage, and the court of appeals found that the husband played a "vital role" in the stockyard's management, and "spen[t] significant amounts of time working to keep his business profitable in an increasingly risky market." Id. The Middendorf court held that these findings were not an abuse of discretion. Id.
Middendorf provides a roadmap for trial courts to follow in determining when separate property's appreciation in value that occurs during the course of a marriage becomes marital property. First, the trial court must determine the value of the separate property as of the date of the parties' marriage. If a party has obtained separate property during the marriage, e.g., by way of gift or inheritance, the trial court must determine the separate property's value at the time of its acquisition. Second, the trial court must determine the separate property's value as of the marriage's termination date. The separate property's value on the date of the parties' marriage, or, if it is obtained during the marriage, its value at its acquisition date, should be subtracted from its value at the marriage's termination date to determine the separate property's appreciation in value during the marriage.
Third, once the trial court has determined the separate property's appreciation in value during the marriage, the trial court must determine whether the appreciation was "due to the labor, monetary, or in-kind contribution of either or both spouses that occurred during the marriage." R.C. 3105.171(A)(3)(a)(iii). If it was, the appreciation is marital property, id., subject to the "equal unless inequitable" principle found in R.C. 3105.171(C). If it was not, the appreciation is separate property, pursuant to R.C. 3105.171(A)(6)(a)(iii), and must be disbursed to the spouse who owns it, pursuant to R.C. 3105.171(D).
Here, the trial court determined the company's fair market value to be $3,935,000, as of March 31, 1999, and held, without explanation, that 25 percent of the company is Skip's separate property, while the remaining 75 percent was marital property to be divided equally between the parties. The trial court did not value Skip's 103 shares in the company as of the date of the parties' marriage, nor did it value his additional 22 shares as of the dates they were gifted to him. Consequently, the trial court was unable to determine the actual appreciation in value of Skip's interest in the company during the parties' marriage.
At the close of evidence in the April 2000 hearing, the trial court requested the parties to address, in their written closing arguments, the corporation's growth from the date of the parties' marriage to the date of its termination. Skip argued "[t]he only evidence the [trial] [c]ourt could reasonably use to determine the 1982 value versus the 1999 value is the book value incorporated in the [c]ompany financials." Gail argued the trial court should use the "fair market value" of Skip's 125 shares established by an August 1993, buy-sell agreement between Skip and his company, which valued Skip's stock at $2,200 per share or $275,000. Gail noted that the company's attorney, Robert Buechner, testified that $275,000 represented the fair market value of Skip's shares at that time. Skip is quick to point out, however, that Buechner also testified the shares' fair market value in 1993 mirrored their book value at that time, and argues there is an inconsistency in Gail's willingness to accept the company's book value as evidence of its fair market value in 1993, but not 1999.
When valuing corporations for purposes of property division in a divorce case, a trial court must determine the corporation's fair market value. See Hunker v. Hunker (Nov. 30, 1987), Butler App. No. CA87-02-024. "Fair market value" is generally defined as "that price which would be agreed upon between a willing seller and a willing buyer in a voluntary sale on the open market." Wray v. Stvartak (1997),121 Ohio App.3d 462, 471. "Book value" is "[t]he value at which an asset is carried on a balance sheet." Black's Law Dictionary (7th Ed. 1999) 177. Book value has also been defined as "cost less accumulated depreciation or the valuation allowance. Book value is based on the historical cost of the asset and may vary significantly from the fairmarket value." (Emphasis added.) Black's Law Dictionary (6th Ed. 1990) 183.
We cannot say the trial court abused its discretion by refusing to follow the parties' recommendations as to how to value Skip's 103 shares at the start of the marriage, or his 22 shares gifted to him during the marriage, since it appears both parties' proposals were unduly slanted in their respective favors. For instance, Gail was "willing" to allow the trial court to use the company's 1993 estimate of the fair market value of Skip's shares, which mirrored the company's estimate of the shares' book value, for purposes of determining his separate property interest in the company as of 1982. But she was unwilling to use the company's book value when valuing the company at the marriage's termination date.
Skip, on the other hand, wants the book values found in the company's financial statements from 1982 to 1999 to be used for all valuation purposes. That has the advantage of "comparing apples to apples," but it appears to have the distinct disadvantage of presenting a less than complete picture of the company's actual value. Indeed, Buechner acknowledged under cross-examination that book value and fair market value were "not necessarily" synonymous, and that the two terms "define two * * * totally * * * different things[.]" And while Buechner testified that the book value of the company's shares mirrored their fair market value, at least in 1993 and 1997, when the company redeemed the shares of Skip's father and sister, Buechner acknowledged that Section 2051 of the Internal Revenue Code has been interpreted to mean that if a corporation redeems a shareholder's stock for less than its fair market value, leaving the shareholder's children as the corporation's remaining shareholders, the redemption is treated as a gift to the children, from which tax consequences will arise.
Nevertheless, the trial court needed to value Skip's 103 shares at the start of the marriage, and his 22 shares acquired in 1984 and 1985. Only then could it determine the amount by which Skip's interest in the company had appreciated in value during the marriage, and subsequent to that, whether the appreciation was due to the labor, monetary, or in-kind contribution of the parties. By declaring that 25 percent of the company was Skip's separate property and 75 percent of the company was marital property, the trial court may have been roughly estimating the value of Skip's shares at the start of the marriage, or it may have been finding that Gail simply was not entitled to one-half of all the appreciation in the company, or it may have been making both of those determinations simultaneously. It is not clear from its decision what the trial court was trying to accomplish by finding that 25 percent of the company was Skip's separate property and the remainder was marital property. Furthermore, it is not apparent that Skip's separate property interest and Gail's marital property interest have been calculated in a reasonably accurate manner.
Therefore, we find that the trial court abused its discretion by not placing a fair market value on Skip's separate property interest in the company at the start of the marriage, and at the time he was gifted an additional 22 shares during the marriage. On remand, the trial court will determine the fair market value of Skip's 103 shares at the start of the marriage, and the additional 22 shares at the time they were gifted to him during the marriage.
In calculating the company's fair market value as of the date of the marriage's termination, the trial court included a valuation of the company's "goodwill." That term has been defined as:
 "the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement, which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices." [Citation omitted.] A much narrower definition has been stated as the probability that the old customers will resort to the old place. [Citation omitted.] Spayd v. Turner, Granzow Hollenkamp (1985), 19 Ohio St.3d 55, 59-60.
 Goodwill is a divisible marital asset. Kahn v. Kahn
(1987), 42 Ohio App.3d 61, 63-65; Wichman v. Wichman
(Mar. 22, 1996), Greene App. No. 95 CA 31.
Skip argues the trial court erred by adopting the testimony of Gail's expert, Edwin Strickling, a certified public accountant, who testified regarding the company's fair market value, which included an estimate of the company's "intangible" or goodwill value. Skip contends the trial court should have disregarded Strickling's testimony in its totality and adopted his proof of the company's book valuations "as representing the only credible evidence available" for valuing the company. We disagree with Skip's argument.
Skip lists numerous reasons as to why the trial court should not have found Strickling's testimony credible. Each of them lack merit. For instance, the facts that Strickling never previously appraised a dirt excavation contractor, and seldom appraised construction companies; that most of his appraisals have been for doctors or medical groups; and that he erroneously sent a report to Skip, even though he had been retained by Gail's attorneys, were insufficient to make his testimony inherently unworthy of belief. The same is true for the fact that Strickling never discussed the company's operations with its management, suppliers, competitors, vendors, customers, or accountants, as he had originally indicated to Gail's attorneys that he needed to do. Strickling plausibly explained that the valuation method he was using to compute the company's intangible value did not require him to contact the persons Skip listed.
Nevertheless, we believe it would be unreasonable for the trial court to include a goodwill value in determining the company's fair market value at the marriage's termination date, but not include a finding of its goodwill value at the start of the marriage, or when Skip acquired the additional shares in 1984 and 1985. Therefore, the trial court shall determine the company's goodwill value at the start of the marriage, and in 1984 and 1985.
Once the trial court determines the fair market value of Skip's separate property interest in the company by the method we have outlined above, the trial court can subtract that amount from the property's fair market value at the marriage's termination date to determine the appreciation in value of Skip's interest in the company during the marriage. When the trial court makes this determination, it must decide, once again, whether the appreciation was due to the "labor, monetary, or in-kind contribution of either or both spouses that occurred during the marriage." R.C. 3105.171(A)(3)(a)(iii). It is the trial court's responsibility to make that determination in the first instance. Nevertheless, for purposes of remand, we note that it would be within the trial court's discretion to find that Gail was not entitled to one-half of all the appreciation in Skip's company during the time of the marriage. Skip was not the majority shareholder in the company until 1993, and did not own all of the company until 1997.
Additionally, we reject Skip's argument that Gail failed to present evidence showing the appreciation in the company's value was due to his labor. Given the evidence presented, it would be well within the trial court's discretion to find that a substantial amount of the appreciation in the company's value was due to Skip's labor, and therefore was marital property. Furthermore, we reject Skip's contention that most of the company's success was attributable to his key employees. The Middendorf
court stated:
 * * * it is the employees and their labor input that make a company productive. In today's business environment, executives and managers figure heavily in the success or failure of a company, and in the attendant risks (e.g., termination, demotion) and rewards (e.g., bonuses, stock options) that go with the respective position. These individuals are the persons responsible for making pivotal decisions that result in the success or failure of the company. There is no reason that these factors should not likewise be relevant in determining a spouse's input into the success of a business.
The evidence revealed that Skip did have employees like Mike Smith and Marty Bray, the company's vice-president and office manager, respectively, who had significant responsibilities at the company. But Skip was responsible for overseeing the work of these employees to whom he attributes the success of the company. Bray described Skip as a "hands-on CEO." Furthermore, while Skip may not have gained a controlling interest in the company until 1993, the evidence demonstrated that Skip has been heavily involved in running the company since the 1970's, and was a pivotal reason for the company's success.
In light of the foregoing, Gail's first assignment of error, and Skip's second cross-assignment of error, are sustained to the extent indicated.
Assignment of Error No. 2:
 THE COURT ERRED BOTH AS A MATTER OF LAW AND IN THE ABUSE OF ITS DISCRETION BY REDUCING THE PROPERTY DIVISION AWARD BY BOTH HYPOTHETICAL TAXES AND IN MISCALCULATING THE TAXES WHEN HUSBAND WAS GIVEN AN OPTION TO SATISFY THE AWARD WITHOUT REQUIRING THE COMPANY'S LIQUIDATION OR SALE OF ASSETS.
Gail presents several issues under this assignment of error. First, she argues the trial court abused its discretion by permitting Skip to elect a plan for paying her for her marital share of the company that the trial court characterized as a "bad business decision." We find this argument unpersuasive.
The trial court did not describe Skip's proposed payment plan as a "bad business decision." Instead, it used that term to describe Skip's refusal to convert the company from C corporation status to S corporation status for federal income tax purposes — a key component of Gail's proposed plan. The trial court rejected this aspect of Gail's proposed plan, stating that while Skip's refusal to elect S corporation status was, in its opinion, a "bad business decision," it did not have the authority to order him to change the corporate structure of his company. Gail acknowledged in her reply brief that a trial court should not order a spouse to make a tax election with regard to his or her business. The trial court also rejected the portion of Gail's plan calling upon Skip to make installment payments to her for ten years, with interest, on the well-settled principle that trial courts "should attempt to disentangle the parties' economic partnership so as to create a conclusion and finality to their marriage." Hoyt v. Hoyt (1990), 53 Ohio St.3d 177, 179
(discussing one of the general guidelines a trial court should follow when considering pension or retirement benefits in a divorce case). We discern no abuse of discretion in the trial court's decision to reject this portion of Gail's plan.
Second, Gail argues the trial court erred and abused its discretion by reducing her marital share of the company by the capital gains taxes Skip would have to pay if he sold the company on March 31, 1999. Gail points out that Skip has no plans to sell the company, now, or at any time in the foreseeable future. She also contends that the capital gains tax may be abolished by the time he sells the company, if he, in fact, ever does sell it. Therefore, she argues, it was unreasonable for the trial court to give Skip credit for the capital gains tax burden he would incur if he were to sell the company on March 31, 1999, since that burden is speculative and hypothetical. We find this argument unpersuasive.
R.C. 3105.171(F)(6) requires the trial court, in making a division of property, to consider "[t]he tax consequences of the property division upon the respective awards to be made to each spouse[.]" In Hermann v.Hermann (Nov. 6, 2000), Warren App. No. CA99-01-006, this court held that a trial court need not consider tax consequences that are speculative, but should consider them if its property division award, in effect, forces a party to dispose of an asset to meet obligations imposed by the trial court. Id.
In Hermann, wife argued that, after properly valuing husband's medical practice at $175,000, the trial court improperly reduced that amount by 31.4% or $55,000 in consideration of the taxable effects of the practice's sale. Id. at 27. Wife contended the taxable effects of the practice's sale were speculative, because husband was not selling his portion of the practice, and the trial court could not determine the impact of future taxes. Id.
This court affirmed the trial court's ruling, finding that the trial court's property distribution effectively forced wife to sell her interest in husband's medical practice, while effectively forcing husband to buy it from her. We concluded that "because the property division forced wife "to dispose of an asset to meet obligations imposed by the [trial] court, the trial court properly considered the tax consequences of that transaction." Id.
Here, both parties agreed, and the trial court concurred, that the company's ownership had to be granted solely to Skip, because "[a]llowing [Gail] to remain a minority shareholder following a divorce is simply not a viable option." The trial court ordered Gail's award reduced by her share of the capital gains tax Skip would incur if he had actually sold the asset. Under the facts of this case, the trial court effectively forced Gail to sell her interest in the company to Skip, and effectively forced Skip to buy it. Therefore, the trial court properly considered the tax consequences of the transaction. Additionally, the trial court's decision to award Skip a credit for the capital gains tax cannot be reviewed in isolation from its overall property award, which included a finding that the company's goodwill was worth $1.2 million.
Finally, Gail argues, in the alternative, that if the trial court did not err by adopting Skip's payment plan, it nevertheless miscalculated the capital gains tax credit it awarded Skip. Skip's only response to Gail's argument is that the trial court heard the testimony of both parties, and "reached its own conclusions of the amount of appropriate tax credit." We agree with Gail's argument.
Skip argued at the hearing held on this matter that Gail's share of the capital gains tax is $329,705, and that subtracting this figure from Gail's marital share of the company, which the trial court had previously calculated to be $1,475,625, would leave her with $1,145,920. His assertions were supported by the testimony of his expert witness, William Thorn.
The trial court, however, gave Skip a capital gains tax credit of $453,534, or $123,829 more than he had requested. The trial court arrived at the $453,534 figure by finding that Gail's marital share of the company was $1,145,000, and by multiplying that amount by the capital gains tax rate of 39.61%. In a subsequent decision, the trial court subtracted the $453,534 amount from $1,475,625 — the amount the trial court had initially determined Gail's marital share of the company to be. This calculation left Gail with an award of $1,022,091, which was $123,829 less than Skip, himself, had calculated she would receive after his tax credit had been deducted from her marital share of the company.
The trial court erred when it found that Gail's marital share of the company was only $1,145,000, when it had already determined it to be $1,475,625. More importantly, the trial court erred by multiplying Gail's marital share of the company by the capital gains tax rate to determine her share of the company's capital gains tax burden. Skip provided expert testimony at the October 2000 hearing, indicating that Gail's share of the tax burden was $329,705. No testimony or other evidence was presented to show that Skip deserved a greater credit than what he had requested.
Therefore, on remand, the trial court is ordered to award Skip a capital gains tax credit of $329,705, the amount to which his expert witness testified he was entitled, and to consider that amount in light of the overall property award.
Gail's second assignment of error is sustained to the extent indicated.
Cross-Assignment of Error No. 3:
 THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING THE MOST VALUABLE HORSES TO DEFENDANT AND FAILING TO PROPERLY CONSIDER THAT IN DIVIDING THE REMAINDER OF THE PERSONAL PROPERTY.
Skip argues the trial court erred when it awarded Gail the parties' more valuable cutting horses, but failed to offset the extra value Gail received when it divided their remaining marital property. He contends the agreement the parties reached at trial was intended to provide for only the "physical division" of the horses between the parties to accommodate their different body types, but was not intended to be a "financial division" of the horses' values. Skip claims that as a result of the trial court's "error," Gail received approximately $133,000 more in marital property than he did.
During her direct examination, Gail testified she and Skip had reached an agreement concerning how their horses were to be divided. She listed several horses she was to keep under the terms of the parties' agreement. At that point, one of Skip's attorneys interposed a question about whether the horses Gail had mentioned were being kept in Texas or Ohio. The trial court stated:
 I don't understand your point. She [Gail] is saying she thinks the agreement is she is to keep the horses, those horses and I would take it from her answers that any ones not named he [Skip] would keep, is that what the agreement is? If your client is not in agreement with that, he'll have to testify in rebuttal.
Skip was asked on rebuttal about how he felt about "Gail's rendition of what she would like to do with the horses[.]" Skip responded as follows:
 There was never a decided matter. It was Sunday when we were trying to do some last minute negotiations to try and keep this from going to Court — are you willing to accept it or not, I mean, I would if the mare [Oaks Tummy Tucker] were to lose her baby, I would like having a chance at that mare having a baby. I sure don't have a problem with her having that mare.
 When asked what his understanding was of the parties "having a deal[,]" Skip stated, "[b]asically she keeps hers and I keep mine and I give her the Oaks Tummy Tuck [sic] and if she were to lose this baby, I would like the opportunity to it [sic] having a baby [.]" At that point, Gail's counsel interrupted Skip, saying, "I don't think Gail has any problem with that suggestion as long as it has a time limit, say the following year." Skip responded, "[a]nd that is very fair and did I have a problems [sic] keeping that mare until the baby is old enough to be weaned[.]"
On May 5, 2000, Skip filed a written closing argument. Attached to Skip's argument was a proposed division of the parties' marital assets, which took into account the values of the horses that the parties had agreed, at trial, to divide between themselves. Skip contended his proposed division of the parties' marital assets was "fair and equitable and is in conformity with the parties [sic] `agreement' regarding division of the horses."
In its May 24, 2000 decision, the trial court found that the parties "agreed to the division of their horses, horse equipment and other personalty." Skip moved the trial court to reconsider several aspects of its decision, including its division of the parties' horses, arguing that "he accepted the proposed horse division because such an allocation would work best with [his] and [Gail's] physical statures. But the horse division was not intended to be an equal division of the monetary value of the * * * horses."
On July 10, 2000, the trial court held a hearing on Skip's motion to clarify and reconsider. During the proceedings, the trial judge stated, "* * * I did not take into consideration the value of the horses. Once you [the parties] told me you reached an agreement, I did not look at the value, you know, maybe I should have." On July 14, 2000, the trial court issued an entry denying Skip's motion for reconsideration. The trial court found that,
 * * * the parties stipulated as to the specific division of the personal property and particularly as to the horses. While their values were greatly skewed in [Gail's] favor, that was the division that both parties orally agreed to in open Court and the Court does not find that it should re-divide their personalty, they having agreed to the division in open Court.
In its January 9, 2001 judgment entry, the trial court noted that the parties "agreed to a division in kind of their horses and horse equipment without regard to value of each horse or the horse equipment and the Court approves the in kind division pursuant to their agreement."
Skip argues "[t]here is nothing in the record to support the Trial Court's decision that [he] and [Gail] `agreed to a division in-kind of their horses and horse equipment without regard to the value of each horse * * *[.]" Skip further argues, "[t]here is nothing in the record to suggest that [he] and [Gail] ever agreed that the stipulated division of horses was intended to be a financial division." We find Skip's argument unpersuasive.
"Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. MorrisCo. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, 280.
The trial court held that the parties agreed to an in-kind division of their horses, without regard to their value. There is sufficient evidence in the record to support that determination.
On direct examination, Gail listed the horses she was to keep under the terms of the parties' agreement. In response to a question from Skip's counsel, the trial court stated that he understood Gail's testimony to mean that she would keep the horses she had named, and that Skip would keep the horses she did not name. The trial court informed Skip that if he was not in agreement with that understanding, he could refute it during his rebuttal testimony. During his rebuttal testimony, Skip was asked what his understanding of the parties' agreement was with respect to the division of their horses. Skip answered, "basically she [Gail] keep hers, and I keep mine[.]" Skip never testified that the parties' agreement regarding the division of their horses was meant only to divide the horses on the basis of their suitability to the parties' respective body types, but not on the basis of their monetary value.
Given the foregoing, Skip's third cross-assignment of error is overruled.
Assignment of Error No. 3:
 THE COURT ERRED AS A MATTER OF LAW AND ACTED ARBITRARILY IN IMPOSING CONDITIONS AND STANDARDS IN CONSIDERING WIFE'S REQUEST FOR SPOUSAL SUPPORT BEYOND THE COURT'S STATUTORY AUTHORITY AND THE CONDITIONS IMPOSED WERE UNREASONABLE, ARBITRARY AND UNCONSCIONABLE.
Gail argues the trial court abused its discretion when it denied her spousal support on the basis that it was "confident that she will be able to either support herself from her own labors or find a wealthy man who is both eager and willing to keep her in the lifestyle that she has grown accustomed to." Gail denounces the trial court's remarks as being "sexist, unreasonable, arbitrary and unconscionable[,]" and asserts that "[f]or a court of law to suggest that a woman is not entitled to spousal support because she has the capacity to go out and find a `sugar daddy' is unbecoming, wrong and clearly reversible error." Gail also argues the trial court erred by failing to consider the standard of living the parties established during their marriage in deciding the issue of spousal support. Gail requests that we reverse the trial court's decision denying her spousal support, and remand the case "with strong suggestions" to the trial court that it recuse itself for the rehearing on grounds of bias.
When a party to a divorce action requests spousal support, the trial court must determine whether support is "appropriate and reasonable." R.C. 3105.18(C)(1). In determining whether spousal support is appropriate and reasonable, and, if so, "in determining "the nature, amount, and terms of payment, and duration of spousal support," a trial court must consider all of the 14 factors listed in R.C. 3105.18(C)(1), which include the parties' income from all sources, including income derived from property divided or disbursed under R.C. 3105.171 (R.C.3105.18[C][1][a]); the parties' standard of living established during their marriage (R.C. 3105.18[C][1][g]); the parties' relative assets and liabilities (R.C. 3105.18[C][1][i]); and any other factor the trial court expressly finds to be relevant and equitable (R.C. 3105.18[C][1][n]). As one authority has stated:
 Strictly construed, R.C. 3105.18(C)(1) does not require a party seeking support to show that an award of support is necessary. Rather than narrowly focusing on the needs of the party seeking support, the statute directs the trial court to use the broader standard of whether support is reasonable and appropriate. Of course the needs of the party requesting support and the ability of the opposing party to pay remain important considerations. In fact, courts continue to give great weight to these two factors. [Footnote omitted.] As a practical matter, proving need and ability to pay is essential in most cases. (Emphasis added.) Sowald Morganstern Domestic Relations Law (1997) 539-540, Section 13.8.
 Had we affirmed the trial court's property division, we would have upheld the trial court's denial of Gail's request for spousal support. The only troublesome aspect of the trial court's decision on this issue was its remark that Gail, whom the trial court described as "extremely attractive, intelligent and talented," "will be able to either support herself from her own labors or find a wealthy man who is both eager and willing to keep her in the lifestyle that she has grown accustomed to." While R.C. 3105.18(C)(1)(n) allows a trial court to consider any factor it expressly finds relevant and equitable in determining whether spousal support is appropriate and reasonable, it is, nonetheless, ill-advised for a trial court to consider the physical attractiveness of one spouse to gauge that spouse's ability to find a future spouse who will keep him or her in a lifestyle to which he or she has grown accustomed. Such a factor is far too subjective for courts to consider.
Nevertheless, we disagree with Gail's contention that the trial court failed to consider the standard of living the parties established during their marriage. The trial court did note Gail had received more than $178,000 from Charles Spence and this was "far more than the support that ninety-nine percent of all wives receive from their spouses." However, the trial court's consideration of this fact did not indicate, as Gail alleges, that the trial court only considered the standard of living of 99% of all other married couples, rather than the standard of living the parties established during their marriage. The trial court properly considered the gifts Gail received from Spence, pursuant to R.C.3105.18(C)(1)(i), which requires the trial court to consider the parties' assets in making a spousal support determination.
Furthermore, it is apparent from its decision that the trial court did consider the standard of living the parties established during their marriage, noting at one point, that Gail's "request to be maintained in the cutting horse lifestyle that the parties adopted is not a reasonable request. The IRS is sure to put an end to all of the tax write-offs that these parties have enjoyed for their `hobby,' which clearly is a money losing proposition." It is well-settled that a party is not entitled as a matter of law to continue the luxurious lifestyle enjoyed during the marriage. Simoni v. Simoni (1995), 102 Ohio App.3d 628, 632. While the lifestyle the parties established during their marriage must be considered by the trial court, R.C. 3105.18(C)(1)(g), there is no requirement that it be duplicated. Simoni at 637, fn. 3.
Additionally, there was ample evidence in the record to support the trial court's finding that Gail will be able to support herself following her divorce from Skip. As the trial court noted, Gail can resume her dog-grooming business she began before she met Skip, and continued to operate while she was married to him. She can also make additional money with her sculptures, which, as the trial court described, "are extraordinary" even to "the untrained eye," and which sell for substantial prices. Also, the property division the trial court awarded Gail would have left her with nearly $2,000,000 in assets.
Nevertheless, this court has reversed the trial court's property division on the grounds explained earlier. R.C. 3105.18(C)(1)(a) requires a trial court, in determining whether to award spousal support, to consider the income of the parties, from all sources, including income derived from property divided or disbursed under R.C. 3105.171. Because we have overturned the trial court's property division award, we feel compelled, under the circumstances of this case, to set aside the trial court's ruling on Gail's request for spousal support. We wish to caution the parties that we are not attempting to signal to the trial court that there should be either a substantial increase or reduction in the property division award Gail received pursuant to the trial court's original decision. We are merely holding that, generally, when a trial court's property division award has been set aside, its spousal support determination should be set aside as well, for possible modification in light of the new property division.
Finally, we reject Gail's request that we "strong[ly] suggest" to the trial court that it recuse itself from this case on the grounds of bias, apparently on the basis of its comment that it was confident Gail could find a wealthy spouse who was eager and willing to keep her in the lifestyle to which she had grown accustomed. While the trial court's comment was ill-advised as we have previously indicated, it would not be appropriate for our court to make such a suggestion to a trial court. This court lacks jurisdiction to remove a trial judge from a case on grounds of bias or prejudice. Beer v. Griffith (1978), 54 Ohio St.2d 440,441-442. The Ohio Supreme Court's Chief Justice, or his designee, has exclusive jurisdiction to determine a claim that a judge of the common pleas court is biased or prejudiced. Section 5(C), Article IV, Ohio Constitution.
In light of the foregoing, Gail's third assignment of error is sustained to the extent indicated.
Judgment reversed, with cause remanded for further proceedings consistent with this opinion.
WALSH, P.J., and POWELL, J., concur.
[1] A "cutting horse" is an "agile saddle horse trained to separate individual animals from a cattle herd." Webster's Ninth New Collegiate Dictionary 319.
[2] A "C corporation" is "[a] regular corporation governed by Subchapter C of the Internal Revenue Code. Distinguished from S Corporations, which fall under Subchapter S of the Code." Black's Law Dictionary (6th Ed. 1990) 341. The major significance [of electing S corporation status] is the fact that S corporation status usually avoids the corporate income tax, and corporate losses can be claimed by the shareholders." Id. at 342.
[3] "Transmutation" is the doctrine pursuant to which a trial court would find, in certain circumstances, that a party's separate property had been converted into marital property. See Kuehn v. Kuehn (1988),55 Ohio App.3d 245, 246. However, the transmutation doctrine has been virtually abolished in this state with the enactment of R.C. 3105.171.Moore v. Moore (Dec. 4, 2000), Brown App. No. CA2000-03-006, at 3. Pursuant to R.C. 3105.171(A)(6)(b), the commingling of separate and marital property "does not destroy the identity of the separate property, except when the separate property is not traceable."